IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CLAUDIO POLO-CALDERON and
JONATHAN POLO-ECHEVARRIA,

**Plaintiffs,**

**v.**

CORPORACION PUERTORRIQUEÑA DE
SALUD and JOAQUIN RODRIGUEZ-
BENITEZ,

**Defendants.**

**Civil No.** 12-1006 (FAB)

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

Before the Court is the motion for summary judgment filed by
defendants Corporacion Puertorriqueña de Salud ("CPS") and Joaquin
Rodriguez-Benitez ("Rodriguez"), (Docket No. 90). Having
considered it, plaintiffs' opposition, (Docket No. 112), and
defendants' reply, (Docket No. 126), the Court **DENIES** defendants'
motion for summary judgment.

## I.   Summary Judgment Standard

Summary judgment serves to assess the evidence and determine
if there is a genuine need for trial. Garside v. Osco Drug, Inc.,
895 F.2d 46, 50 (1st Cir. 1990). The Court may grant a motion for
summary judgment "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is
"material" if it has the potential to "affect the outcome of the

suit under the governing law." Id. A dispute is "genuine" when it "could be resolved in favor of either party." Calero-Cerezo v. U.S. Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004). The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). It must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion. Id. (citing Fed.R.Civ.P. 56(c)). Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).

It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "[A] party opposing summary judgment[, therefore,] must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis, 23 F.3d at 581 (internal citation omitted). In making this assessment, the Court must take the entire record in the light most favorable to the nonmoving party

Civil No. 12-1006 (FAB)                                                3

and draw all reasonable inferences in its favor.  Farmers Ins.
Exch. v. RNK, Inc., 632 F.3d 777, 779-80 (1st Cir. 2011).

## II.  Facts

Defendant Rodriguez is the President of CPS.  (Docket No. 91
at p. 1.)  Rodriguez is the godfather of plaintiff Jonathan Polo-
Echevarria ("Polo")'s younger brother, and Rodriguez's wife, Tachin
Rodriguez, is the first cousin of Polo's father, plaintiff Claudio
Polo.  Id.  Jonathan Polo, who was 17 years old at the time of the
events in question, considered Rodriguez to be his uncle.  (Docket
No. 98-1 at p. 27.)

On January 21, 2011, Polo was hired as an office clerk at CPS
through a professional services contract.  (Docket No. 90-1; Docket
No. 118-2 at p. 3.)  He performed document shredding at CPS's
Gurabo office, (Docket No. 91 at p. 4; Docket No. 118 at p. 4), and
earned $7.25 per hour for his work.  (Docket No. 90-1.)  He
rendered services from January 22, 2011 until February 4, 2011,
working a total of 42.5 hours.  (Docket No. 91 at p. 4; Docket
No. 118 at p. 4; Docket No. 128-1 at p. 3.)  Rodriguez was the
person who gave Polo the office clerk job at CPS.  (Docket No. 118-
2 at p. 3; Docket No. 118-7 at p. 4.)  Elba Navarro is the
Accounting Area Supervisor of CPS who supervised and assigned work
to Polo.  (Docket No. 91 at p. 2; Docket No. 118-6 at pp. 5-7.)
Polo was available to work after 2 p.m., and on Fridays from 8 a.m.
to 5 p.m.  (Docket No. 118-6 at p. 7.)

Between Friday, February 4, 2011 and Monday, February 7, 2011, Polo communicated via text message with an unidentified person, known only as prpng@hotmail.com and "Siempre Atento".  (Docket No. 91 at p. 2; Docket No. 118 at p. 2.)  Polo does not know who created the email account or to whom it belongs.  (Docket No. 91 at p. 2; Docket No. 118 at p. 2.)  Rodriguez denies that the email address is his, and he claims not to know who owns the account.  (Docket No. 118-2 at p. 22.)  The messages reflect the following interactions[1]:

**Friday, February 4, 2011:**

1:11 p.m. (from prpng@hotmail.com):  I see you again and I can't contain myself.  I want to grab your ..........

        (from Polo): You're back.  Tell me who you are.

        (from prpng@hotmail.com):  I can't even if I wanted to.

1:21 p.m. (from Polo):  Well, unfortunately nothing will happen if I don't know who you are.  I might be interested in you and you don't know it.

1:23 p.m. (from prpng@hotmail.com):  40 something and I could have a chance?

---

[1] The Court notes the difficulty of discerning the exact time the messages were sent and in what order, due to the various manners of discovery of the emails and messages.  It thus accepts the parties' agreement on the contents, (Docket No. 91 at pp. 6–13; Docket No. 118 at p. 7), and reconciles those messages with the exhibit demonstrating the written messages, (Docket No. 90-2), and the descriptions of the messages in Polo's deposition, (Docket No. 98-1).  None of the messages has been edited for grammatical or typographical accuracy.

1:25 p.m. (from Polo): Who knows!

(from prpng@hotmail.com): Tell me the names of 40 year-olds you know and that could have a chance with you.

(from Polo): No. I'm tired of asking. It's the only question I've asked you and if you don't want to answer it, it's your problem.

1:34 p.m. (from prpng@hotmail.com): Understand me. Don't get upset with me.

(from Polo): I'm not upset I'm only saying that you are afraid I don't know why.

6:06 p.m. (from prpng@hotmail.com): Hey guy, I've got a lot to risk.

(from Polo): But it's that this is between you and me!

6:22 p.m. (from prpng@hotmail.com): Give me a break, answer my ?

(from prpng@hotmail.com): I was going to recommend that you don't shave your chest. It should look really good on you. Give me a chance. Give me several names please.

**Saturday, February 5, 2011:**

5:36 a.m. (from Polo): No! You already know what the deal is, tell me or nothing is going to happen.

6:04 a.m. (from Polo): If you don't want to tell me who you are, what can I do? Nothing, you just keep on looking.

6:11 a.m. (from Polo): Life is about risks. If you don't tell me, well, farewell.

(from prpng@hotmail.com): Risks yes, but calculated risks. Yes, If I manage to know what level of possibility I have I'll plunge in.

6:17 a.m. (from Polo): So the only thing you will know is that I like white mature ones, short like I am. There are several mature persons that I'm interested in.

(from prpng@hotmail.com): Since you are not telling me a name, I'm advancing you to I'm short, mature, white, and with a lot of body hair.

6:22 a.m. (from Polo): If you are the person whom I think you are I wanted this to happen since a long time ago.

6:26 a.m. (from Polo): you appear to be the person whom I think you are.

9:17 a.m. (from prpng@hotmail.com): Thank you we are walking. We continue another day. I don't want to overwhelm you.

9:55 a.m. (from prpng@hotmail.com): I can't, the best thing is for me to look at you from afar. Something is better than nothing.

10:02 a.m. (from prpng@hotmail.com): How can you say okay? how can you live thinking that there's someone that is looking at you with a desire of jumping on you and be okay? You're stronger than what I thought.

(from Polo): Well, if you don't want to tell me who you are, what can I do? Nothing, just stay staring.

(from prpng@hotmail.com): I would like to tell you. That's why I'm asking you for some names to know if I have some opportunity or I best just stay staring. Understand me.

4:18 p.m. (from prpng@hotmail.com): we need to talk. I'll tell you when and where another day

4:26 p.m. (from Polo): Tell me is it you?

(from prpng@hotmail.com): WAIT NOT THROUGH HERE

(from Polo): through where?

(from prpng@hotmail.com): when I know that I'll let you know sending a text. In meantime, start thinking about everything that I've asked you so you can answer it.

4:43 p.m. (from Polo): Well I'm not going to be meeting with you if I don't know who you are.

4:56 p.m. (from Polo): As far as I'm concerned you were the one that I said you are.

(from prpng@hotmail.com): and if I were, you would understand why is it that we have to talk.

5:09 p.m. (from Polo): I am not going to talk in front of a person that I don't know. Talk to me through here. And if you tell me who you are, and I know you, then we can talk face to face.

(from prpng@hotmail.com): I have to go. I'll write you another day.

(from prpng@hotmail.com): Can you have lunch tomorrow at Plaza Centro? How much time do you have?

Civil No. 12-1006 (FAB)                                                    8

**Sunday, February 6, 2011:**

(from prpng@hotmail.com): Did you get it up today and think of me?

(from Polo): No because I don't know who you are

7:00 p.m. (from Polo): About what? I told you, if you don't tell me who you are, we are not going to having any type of person-to-person conversation

7:10 p.m. (from prpng@hotmail.com): I left I'll call you tomorrow

(from prpng@hotmail.com): At what time can you be in front of Roger Electric and I will pick you up. If you don't want, you don't want to get in.

(from Polo): I'm not going to have any type of personal communication with you, unless I know who you are. You are mistaken, I'm not that easy.

(from Polo): until I know who you are, I'm not going to be confirming anything for you

(from prpng@hotmail.com): The thing is that I told you that I'm not dumb playing you and that I'm going to send you a text message before arriving so you know who I am. I only need the exact time that you can be at Roger.

**Monday, February 7, 2011:**

5:23 a.m. (from prpng@hotmail.com): At what time do you get off this afternoon? The day is a bit complicated.

(from Polo): Dito

6:01 a.m. (from prpng@hotmail.com): don't feel bad it's not such a big deal. Although I know you're joking with me. Tell me at what time can you this afternoon?

6:08 a.m. (from Polo): I always have an hour and then, I go to work. And this is the last time. You tell me who you are or I'm going to duck/ignore the texts. If in the next text message you don't tell me your name, bye.

8:48 a.m. (from prpng@hotmail.com): The other day you asked me a question and I ignored it. The answer is yes.

8:52 a.m. (from Polo): what question

12:56 p.m. (from prpng@hotmail.com): ok you'll have to think about it.

        (from Polo): ok

        (from Polo): are you the one that gave me a job?

1:10 p.m. (from prpng@hotmail.com): thats the only one that was left pending

        (from prpng@hotmail.com): with whom are you with?

        (from Polo): in my home

        (from prpng@hotmail.com): is to call you when you are alone

        (from Polo): Im alone, but I'm not going to answer any call of a number that I don't know because I don't know who you are for sure. And if you're the one that gave me the job, well, then, tell me something that not everybody knows.

On the afternoon of Monday, February 7, 2011, Polo did
not go to work at CPS. (Docket No. 91 at p. 13; Docket No. 118 at
p. 7.)[2] Polo testified that he did not show up to work because he
"came to realize" that Rodriguez was the one who had been sending
him the text messages, and he "didn't want to be close to him."
(Docket No. 98-1 at pp. 33-34.) Later that day, Rodriguez called
Polo to inquire about his absence from CPS. (Docket No. 91 at p.
6; Docket No. 118 at pp. 6-7.) When Rodriguez was leaving the
office, he noticed that Polo was not around the area where he
usually passes by, and consequently he telephoned Polo from his
car. (Docket No. 118-2 at p. 16.) Polo claims that Rodriguez
called to ask him if everything was ok, and that he told Polo at
the end of the conversation "not to tell anybody about the text
messages." (Docket No. 98-1 at pp. 30, 35, 216.)

Later that evening, Polo received the following two text
messages:

7:51 p.m. (from prpng@hotmail.com): WERE YOU FRIGHTENED OR
WERE YOU GLAD?

8:29 p.m. (from prpng@hotmail.com): WHAT HAPPENED?
(Docket No. 91 at p. 13; Docket No. 118 at p. 7.) Also during that
Monday, Polo's uncle, Norberto Polo, called Rodriguez to speak to

---

[2] Although it is unclear to the Court if and when Polo was
scheduled to work on Monday, it can be inferred from Ms. Navarro's
testimony that Polo would not have been scheduled to work until
after 2 p.m. (Docket No. 118-6 at p. 7.)

him about what had happened with Polo. (Docket No. 91 at p. 14; Docket No. 118 at p. 8.) Rodriguez testified that Norberto was "almost yelling" at him, claiming that Rodriguez "was meddling" with someone that Rodriguez should not, and saying "that [Noberto] was going to take that to the last consequences." (Docket No. 118-2 at p. 5.) Later that night, Jonathan Polo contacted Rodriguez's wife, Tachin Rodriguez, to tell her about the text messages he had exchanged with her husband. Id. Polo and his father met with Ms. Rodriguez that night at the Prados Shopping Center, but Mr. Rodriguez stayed home. (Docket No. 118-2 at pp. 10-11.) In their meeting, Polo and his father showed Ms. Rodriguez all of the messages that had been sent to Polo's phone. (Docket No. 118-5 at p. 5.)

The next morning on February 8, 2011, Rodriguez made the decision to terminate Polo's services. (Docket No. 118-2 at p. 4.) His proffered reason for firing Polo is the following:

> On Monday, February 7, 2011, I received a phone call from Jonathan Polo's uncle and after it[,] there was a communication with my wife for some allegations that he was making. From that [sic] on I decided that it was not prudent to have him working at the company. So the next day I called the office to have his contract terminated.

(Docket No. 118-2 at p. 4.) Specifically, Rodriguez spoke to Ms. Navarro, and "gave her the basic information that the contract was terminated." (Docket No. 118-2 at p. 14; Docket No. 118-7 at pp. 7-8.) That same morning, Polo hand-delivered a letter to the CPS office at HIMA-San Pablo Caguas, informing them of "sexual

harassment by Joaquin Rodriguez" and requesting that "the necessary corrective measure be taken . . . ." (Docket No. 90-4.) Rodgriguez claims that he had already fired Polo before he learned of Polo's letter. (Docket No. 118-2 at pp. 18–19.) Polo did not go to work at the Gurabo office on February 8, 2011. (Docket No. 91 at p. 13; Docket No. 118 at p. 7.) On February 9, 2011, Polo showed up for work, and Ms. Navarro told him that his contract was terminated. (Docket No. 91 at p. 14; Docket No. 118 at p. 9.)

## III. Plaintiff Jonathan Polo's Standing

As a preliminary matter, defendants argue that Polo was not an employee of CPS, and thus "lacks standing to sue under any of the laws claimed in the complaint." (Docket No. 90 at p. 7.) At the motion to dismiss stage, the Court noted that "CPS does not dispute that Jonathan provided services to CPS or that CPS is an employer." (Docket No. 47 at p. 8) (citing Docket No. 27 at p. 4; Docket No. 37 at p. 2.) At the summary judgment stage, defendants must establish that Polo was not an employee pursuant to the common law agency test. See Alberty-Velez v. Corporacion de P.R. para la Difusion Publica, 361 F.3d 1, 6 (1st Cir. 2004). In weighing the hiring party's "right to control the manner and means by which the product is accomplished," a court considers the following relevant factors:

    the skills required; the source of the instrumentalities
    and tools; the location of the work; the duration of the
    relationship between the parties; whether the hiring
    party has the right to assign additional projects to the

> hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment;
> the hired party's role in hiring and paying assistants;
> whether the work is part of the regular business of the
> hiring party; whether the hiring party is in business;
> the provision of employee benefits; and the tax treatment
> of the hired party.

Alberty-Velez, 361 F.3d at 7.  The First Circuit Court of Appeals has explained that while no factor is determinative, "in most situations, the extent to which the hiring party controls the manner and means by which the worker completes her task will be the most important factor in the analysis."  Id.

Defendants have engaged in absolutely no legal analysis of this issue and thus have done nothing more than "mention a possible argument in the most skeletal way, leaving the Court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Due to their woefully undeveloped argument, defendants have not met their summary judgment burden.  Moreover, plaintiffs point to sufficient evidence demonstrating that Polo was not an independent contractor, but an employee of CPS.  (See Docket No. 112 at pp. 7–9 and cited exhibits.)  Accordingly, the Court **DENIES** defendants' request for summary judgment on the grounds that it was not plaintiff Polo's employer.

## IV.  Plaintiffs' Title VII Discrimination Claim

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national

origin.  42 U.S.C. § 2000e-2(a).  Sexual harassment is a form of sex-based discrimination.  <u>Vera v. McHugh</u>, 622 F.3d 17, 26 (1st Cir. 2010).  If an employer requires an employee "to work in a discriminatorily hostile or abusive environment," it violates Title VII.  <u>Gerald v. Univ. of P.R.</u>, 707 F.3d 7, 17 (1st Cir. 2013).  Plaintiffs claim that defendant Rodriguez's actions created a hostile work environment.  (<u>See, e.g.</u>, Docket No. 112 at p. 2.) In order to prevail on their hostile work environment sexual harassment claim, plaintiffs must establish:  (1) membership in a protected class, (2) some basis for employer liability, and (3) unwelcome sexual harassment, (4) which was based on sex, (5) was sufficiently severe or pervasive, and (6) was objectively and subjectively offensive.  <u>Id.</u>  The Court discusses each element in turn.

There is no doubt that plaintiff Polo is a member of a protected class.  "The Supreme Court has addressed the issue of whether men are a protected class under Title VII and has held that '[s]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII.'"  <u>Rosado v. Am. Airlines</u>, 743 F. Supp. 2d 40, 57 (D.P.R. 2010) (Besosa, J.) (citing <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 75-81 (1998)).  The Court also finds that vicarious liability exists for CPS because the company's president — defendant Rodriguez — was empowered to take tangible employment actions against Polo and allegedly created the

actionable hostile work environment.  See Gerald, 707 F.3d at 19-20; see also Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013) ("[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim.").  As instances of the alleged sexual harassment by defendant Rodriguez,[3] plaintiffs point to a series of text messages interchanged between Polo and the email account of prpng@hotmail.com between February 4, 2011 and February 7, 2011.  It cannot seriously be disputed that the messages were "based on sex."  (See Docket No. 90-2) (The messages from prpng@hotmail.com state: "I see you again and I can't contain myself. I want to grab your .........."; "40 something and I could have a chance?"; "Tell me the names of 40 year-olds you know and that could have a chance with you?"; "I was going to recommend that you don't shave your chest.  It should look really

_____

[3] Although the owner of the prpng@hotmail.com account has not been identified, the messages present sufficient evidence supporting the reasonable conclusion that "the person who hired" Polo — defendant Rodriguez — was the person sending the messages to Polo.  (Docket No. 90-2 at pp. 36-40)("The other day you asked me a question and I dodged it. The answer is yes." / "What question? . . . That if you're the one that gave me the job? . . . It's the only one pending?" / "Yes!").  In his deposition, Polo also claimed to know that Rodriguez was the person sending him messages because Rodriguez called him on February 7, 2011 and told him "not to tell anybody about the text messages."  (Docket No. 98-1 at pp. 30, 35, 216.)  Taken as a whole, that evidence defies defendants' contention that "[p]laintiff did not even have evidence that it was Rodriguez himself the one texting with him and as such, there is no reasonable way in which the texting could have affected his terms and conditions of employment."  (Docket No. 90 at p. 13.)

good on you.  Give me a chance.  Give me several names please.";
"Did you get it up today and think of me?").  Accordingly, the
first, second, and fourth elements of a Title VII hostile work
environment sexual harassment claim are satisfied.  Whether
defendant Rodriguez's alleged conduct constituted sexual harassment
that was unwelcome, severe or pervasive, and objectively and
subjectively offensive, however, present points of contention
between the parties.

Evidence of unwelcomeness can be gleaned from Polo's
deposition testimony as well as his behavior on February 7th and
8th, 2011.  Polo says he decided not go to work on February 7th
because he "came to realize" that Rodriguez was the one who had
been sending him the text messages, and he "didn't want to be close
to him."  (Docket No. 98-1 at pp. 33-34.)  He also explained that
he felt "uncomfortable" returning to work with Rodriguez.  (Docket
No. 98-2 at p. 17).  That Polo did not request whoever was sending
the messages to stop, (Docket No. 98-1 at p. 44); that he failed to
communicate such a sentiment directly to Rodriguez, (Docket No. 98-
1 at p. 35); or that he sent reply messages to the prpng account
which may have suggested interest or constituted flirtation,
(Docket No. 90-2 at p. 2; Docket No. 98-2 at p. 31); do not
conclusively establish that Polo *welcomed* the messages.  Indeed,
Polo indicates that his uncle told him to "go along" with the
messages to find out who was sending them to Polo, (Docket No. 98-2

at p. 96); and that upon concluding on February 7th that Rodriguez was the person sending him messages, Polo delivered a letter to CPS reporting Rodriguez's behavior the next morning. (Docket No. 90-4 at p. 1.)   At the very least, the evidence raises a factual question as to whether Rodriguez's alleged conduct was unwelcome — an issue for the jury to decide.   See Gerald, 707 F.3d at 17 ("In the context of sexual harassment claims, the question of 'whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact,' and this case is no exception.") (citing Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986)).

Even assuming that the conduct was unwelcome, Title VII does not cover *all* harassing conduct and therefore requires that the alleged sexual harassment "be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" in order to be actionable.   Vera, 622 F.3d at 26 (internal punctuation and citation omitted).   "There is no mathematically precise test to determine whether a plaintiff presented sufficient evidence that he or she was subjected to a severely or pervasively hostile work environment."   Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal punctuation and citation omitted).   The Court must consider all the circumstances, including (1) the frequency of the harassing conduct, (2) its severity, (3) whether it was physically

threatening or humiliating as opposed to a mere offensive utterance, (4) whether it unreasonably interfered with an employee's work performance, and (5) the effect of the conduct on the employee's psychological well-being. Vera, 622 F.3d at 26. The First Circuit Court of Appeals has noted that no single consideration pertaining to the "severe or pervasive" inquiry is individually determinative. Gerald, 707 F.3d at 18. A hostile work environment claim is thus based upon the cumulative effect of individual acts that may not by themselves be actionable. Rivera-Garcia v. Sprint PCS Caribe, 841 F. Supp. 2d 538, 556 (D.P.R. 2012) (Perez-Gimenez, J.) (citing Nat'l. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-116 (2002)). Courts are tasked with distinguishing:

> facts that merely add up to the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing, which can never support a Title VII claim, from those suggesting sexual remarks, innuendoes, ridicule, and intimidation[,] which may be sufficient to support a jury verdict for a hostile work environment.

Vera, 622 F.3d at 27. Because this examination is fact specific, it is normally best for the jury to decide, but "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." O'Rourke v. Providence, 235 F.3d 713, 729 (1st Cir. 2001) (internal citations omitted).

Taking the evidence in the light most favorable to plaintiff Polo, sufficient evidence exists from which a reasonable jury could

determine that Rodriguez's actions were "severe or pervasive."
Although the messages plaintiffs submit occurred over a short
three-day period, the prpng user sent over 25 messages at all hours
of the day that communicated explicit sexual desire for and the
propositioning of the teenager.  (Docket No. 90-2.)  Evidence of
sufficient frequent and severe harassing conduct, therefore, easily
exists in the record.  See Gerald, 707 F.3d at 18 ("A single act of
harassment may, if egregious enough, suffice to evince a hostile
work environment."); Billings v. Town of Grafton, 515 F.3d 39, 48
(1st Cir. 2008) ("[B]ehavior like . . . come-ons[] and lewd remarks
is often the stuff of hostile environment claims.").  Furthermore,
the Court finds sufficient evidence in the record from which a jury
could reasonably conclude that Rodriguez's alleged behavior
unreasonably interfered with the employee's work performance and
psychological well-being:  when Polo concluded it was his uncle who
was sending him the messages, he felt so uncomfortable that he did
not work at Rodriguez's company for two days.  Due to Rodriguez's
close familial relationship with Polo, Rodriguez learned of Polo's
rejection of his advances through Polo's uncle as well as through
Rodriguez's wife.  Sufficient evidence demonstrates, therefore,
that Rodriguez may have attempted to pre-empt a hostile work
environment claim as soon as the potential for one arose, by
deciding to fire the teenager before Polo submitted his sexual
harassment letter to CPS.  The Court will not condone a party's use

of personally attained information to attempt to circumvent legal liability by manipulating the effect of an anticipated exercise of another's Title VII protections.  Taken as a whole, the evidence presented is enough to allow a reasonable jury to conclude that Polo was subjected to a severe or pervasive hostile work environment.

The final inquiry is whether Rodriguez's alleged conduct was both objectively and subjectively offensive.  "Said another way, would a reasonable person find the conduct hostile and abusive and did the complainant in fact perceive it to be so." Gerald, 707 F.3d at 19.  Plaintiffs have offered adequate evidence of subjective offense:  as recited above, the messages from prpng@hotmail.com made Polo feel so uncomfortable that he "didn't want to be close to" Rodriguez and thus Polo missed work for two days; that Polo did not respond to prpng@hotmail.com's messages once Polo concluded that it was his uncle; that Polo and his father met with Ms. Rodriguez to show her all of Rodriguez's alleged text messages; and that Polo delivered a hand-written sexual harassment complaint on Tuesday.  The Court also finds Rodriguez's alleged conduct to fall sufficiently within the realm of what a reasonable person might find offensive.  The messages contain sexual innuendo and requests allegedly sent by a 40-year-old who is not only family but also has a dominant role over a 17-year-old at work.  Because plaintiffs offer enough evidence on this element, therefore, their

sexual harassment hostile work environment claim pursuant to Title VII withstands summary judgment.

## V.   Plaintiffs' Retaliation Claim

When an employer discriminates against its employee because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing," the employer violates Title VII's anti-retaliation statute.   42 U.S.C. § 2000e-3(a); Vera, 622 F.3d at 32.   A plaintiff must first make out a *prima facie* claim of retaliation by showing (1) that he or she engaged in protected conduct, (2) that he or she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action.   Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997).   A rebuttable presumption of unlawful retaliation then arises, and "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision." Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (citation and quotation marks omitted).   If the employer presents evidence of a non-discriminatory reason for firing the employee, "the presumption drops from the case and the court must focus on the 'ultimate factual issue.'" Vera, 622 F.3d at 32-33 (citing U.S. Postal Serv. Bd. of Governors v. Aiken, 460 U.S. 711, 715 (1983)).   In this case, the ultimate factual issue is whether plaintiffs have cited facts in the record from which a

reasonable jury could conclude that Polo experienced an adverse employment action because he filed a sexual harassment complaint against Rodriguez.  See Vera, 622 F.3d at 33.

The first and second *prima facie* elements of a Title VII retaliation claim are easily satisfied here: Polo delivered an internal grievance of sexual harassment to CPS on February 8, 2011, and Ms. Navarro informed him that he was fired the next day.[4]  The evidence also supports the third element, a causal link between Polo's protected activity and his termination.  A plaintiff may demonstrate causation "by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action."  Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) (*per curiam*); see also Bibiloni Del Valle v. Puerto Rico, 661 F. Supp. 2d 155, 170 (D.P.R. 2009) (Acosta, J.) ("Depending on the particular set of facts at hand, 'temporal proximity alone can suffice to meet the relatively light burden of establishing a *prima facie* case of retaliation.'") (quoting DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008)).  In this case, plaintiff hand-delivered his grievance letter — albeit to a different CPS location — just one day before he was terminated. That time period unquestionably passes the temporal proximity test.

_____

[4] At most, Rodriguez's contention that he made the decision to fire Polo in response to the February 7, 2011 communications between Polo's father, uncle, and Ms. Rodriguez — and therefore before learning of Polo's sexual harassment letter — creates a issue of material fact for the jury.

See <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 828 (1st Cir. 1991) (citing case law upholding a one-year time period as well as a 9-month lapse between employees' filing of a discrimination complaints and subsequent terminations as sufficient to establish causation). Strong inferences may be drawn from the temporal proximity (1) that Rodriguez resented Polo for filing a sexual harassment grievance against him, and (2) that he used his power as president of CPS to fire Polo because of that grievance. Keeping in mind that the *prima facie* case is "a small showing that is not onerous and is easily made," <u>Che</u>, 342 F.3d at 39 (citation omitted), the Court finds that plaintiffs have set forth sufficient circumstantial evidence to meet all elements of a *prima facie* retaliation claim. Furthermore, the First Circuit Court of Appeals recognizes that "where a plaintiff . . . makes out a *prima facie* case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious about granting the employer's motion for summary judgment.'" <u>Kelley v. Corr. Med. Servs.</u>, 707 F.3d 108, 115–16 (1st Cir. 2013). Given that defendants claim Polo was fired "because Rodriguez felt threatened by Polo's uncle," (Docket No. 90 at p. 21), questions of material fact remain regarding the retaliation claim. Accordingly, the Court **DENIES** defendants' motion for summary judgment of plaintiffs' Title VII retaliation claim.

**VI.  Conclusion**

For  the  reasons  discussed  above,  defendants'  motion  for summary judgment, (Docket No. 90), is **DENIED.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, January 13, 2014.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge